You can call the first case. Case number 17-0540, Marge Kaplan v. Brian Kaplan v. Joel Kaplan. We're going to step up and we're going to argue and please identify yourselves please. Good morning. Brian Edward Wells, I represent the appellant Joel Kaplan. Eric Dworkin, I represent the athletes Marge and Brian Kaplan. All right. Gentlemen, you'll have 15 minutes apiece. Counsel, if you want to reserve a couple of minutes for rebuttal, you certainly can do so. Yes, I'd like to reserve about five. Okay, that's fine. Thank you. Whenever you're ready. Thank you, Your Honor. May it please the Court. In the trial court's January 26, 2017 ruling, the court stated it was the opinion of the court that Joel Kaplan, that the evidence clearly and convincingly demonstrated that Joel Kaplan was totally incapable of making personal and financial decisions and was in need of a plenary guardian of his person and estate. And the actual order that was entered the following day on January 27th incorporated those findings, as well as the finding that limited guardianship would not provide sufficient protection for Joel Kaplan. So it was the appellant's contention that it was against the manifest weight of the evidence. The trial court's order was against the manifest weight of the evidence since the order was unreasonable and not supported by the evidence, especially our contention that he is not totally incapable of making personal and financial decisions, and also that limited guardianship would not provide sufficient protection. We also believe the trial court's order is against the manifest weight of the evidence with respect to appointing his sons, Mike and Brian, as his co-guardians. Now, in appointing a plenary guardian, the statute requires that the petitioners demonstrate by clear and convincing evidence that the person with a disability, in this case Joel Kaplan, is totally incapable of managing his personal and financial affairs. With a clear and convincing evidence standard that the word totally is not defined in the statute. Now, since it's not defined in the statute as a rule of statutory construction to give us plain and ordinary meaning, and the plain and ordinary meaning of totally is whole, full, complete, and absolute. So with respect to the statute and the purposes and objectives of the statutes, the trial court's order necessarily found that the evidence clearly and convincingly demonstrated that Joel Kaplan was fully, completely, and absolutely incapable of making any personal or financial decision. And the plenary appointment must also be construed as a matter of construction in accordance with the purpose and objectives of the statute. There are two of them which are referenced in 11A.3B. Guardianship can be utilized only as is necessary to protect the well-being of the person with a disability, to protect them from neglect, exploitation, or abuse, and to encourage development of maximum self-reliance and independence. And guardianship shall be ordered only to the extent necessary by the individual's actual limitations. Now, with respect to the court's ruling, again, in support of its ruling that Joel totally lacked all capacity to make or communicate decisions regarding this person, the court cited five factors which are listed on page 34 in my original brief. That he requires private caregivers to assist him with his activities of daily living, that he fired various caregivers, there was a laundry incident, and the court also pointed specifically to the testimony of Joel's guardian and loyalty, and also to the medical report of Dr. Amder. Now, this case was a little bit different than most cases that are tried on disability because it's stipulated and undisputed that none of the doctors, none of the three doctors, appeared to personally testify at trial. So it's not a situation where the court could, you know, review what they were doing, assess their credibilities. All the court had was the written reports of the doctors. Now, there's a point in fact, the guardian of Lyla testified in favor of the appointment of a limited guardian. The medical report of Dr. Amder, in his, he testified or stated in his report, he did not review any medical records regarding Mr. Kaplan. He stated that the stroke caused deficits in executive functioning and possibly memory impairments and referenced possible vascular dementia. And the only assessment he investigated was not for a cognitive assessment, and the results were consistent with only slight to mild cognitive impairment. And that's the medical testimony that supported the trial courts, ruling that he's totally incapable of making any decisions. With respect to the findings on the plenary state guardian for Mr. Kaplan, the court cited six factors which were listed on page 42 of my original brief. It included the circumstances which initially prompted Ryan and Mark to file the petition. There's various, he gave his pin to a caregiver who took some money. There were some cash withdrawals. He was unable physically to review his financial statements because he has such severely impaired vision. He signed a contract with the Lyla Home, a new agency. And again, the medical report of Dr. Amder and the guardian of Lyla. Now, the guardian of Lyla, again, recommended a limited estate guardian. So I'm not sure how that can possibly support a finding of total disability, which would require a plenary appointment. I also referenced the McPee case, which states it's not whether you can complete any task without assistance. It's whether you can direct dollars which will necessitate or require the appointment of a guardian to assist you with your affairs. And in this case, just like in the McPee case, Joe did what was appropriate. After his stroke in 2014, he signed powers of appointments, naming his sons as his agents to assist him. He also signed a trust about four months after his stroke, which appointed his sons co-trustees to help him manage his estate, which is valued at roughly $8 million. A lot of the issues, you know, that were referenced by the court, you know, Joe tried to explain away and said, I have severe vision problems. I think it's undisputed he's actually blind in his left eye. So he can't see the statements or the PIN numbers. And he not only agrees that he needs assistance, but he welcomes it. Now, the court also made a, who also believed, and that's our contention, that it's against the manifest way of the evidence for the trial court to find that limited guardianship will not provide any sufficient protection for Joe. In the court's ruling, the court cited three factors. They start by stating that limited guardianship will not provide the sufficient protection. First, the statements of the guardian in writing. The court stated the diagnosis provided by Dr. Andrew, even though Dr. Andrew did not provide a diagnosis. And because of the reasons that the court reviewed, the PINs, you know, some of the earlier issues where exploitation in finances were at issue. In their brief, the appellees, let me just regress for one second. With respect to the limited guardianship, the guardian in writing clearly recommended the appointment of limited guardians for Joel's person in the state. And the guardian in writing testified that in his opinion, limited guardianship is sufficient to protect him and to address all the issues that were before the court. Dr. Shaw also agreed with that and stated that he believed also to a reasonable degree of medical certainty that a limited personal guardian and a state guardian is sufficient to address all of Joel's issues. The appellees in their brief talked about- Sorry. Ultimately, the issue as to whether a plenary guardian or a limited guardian was for the trial court. Yes. The trial, right. I agree with that. But the Barr case that I cited in my brief, I think supports the contention that in cases such as this, the trial court can be reversed on a manifest late standard if the court believes that it decided- if the finding wasn't reasonable or that the evidence just didn't support the record. In that case, which is a first district case, the trial court did reverse the trial court's appointment of a plenary guardian. And specifically noted that the appointment of a plenary guardian in that case, and I argue absolutely in this case, does not support the appointment of a plenary guardian and does not really promote any of the objectives or purposes of the statute, which is to make Joel as independent as he can be in light of his limitations. So there is authority for the court to reverse if the court believes that the evidence that was produced in this trial is unreasonable and does not support the finding of a plenary guardianship. But you do agree- I mean, you're not really disputing that Mr. Kaplan is disabled. No, I'm not. And you're not disputing that a guardian is the right way to go under these circumstances. That's correct. The dispute here is- and this is so important to him that this is why we brought the appeal- is the appointment of a limited guardian and not a plenary guardian. Because by statute, once a plenary guardian of a person is appointed, all of the authorities, all the personal authorities that are listed in 11A17 are transferred to his plenary guardian for him to make. With respect to plenary estate guardian, all of the authorities in 11A18, all those authorities and the decisions are transferred to his guardians. So at this point, in light of the appointment of a plenary guardian, Mr. Kaplan cannot choose or decide where to live, who can visit him. There's no authority for him to, you know, manage a monthly stipend. And given the fact that a plenary guardianship as a matter of law under 11A22 means that any contract he would sign is void as a matter of law, he can't retain an attorney to address any of his issues before the court. So if he has an issue with respect to visitation, where he lives, simply managing a $5,000 stipend per month out of an $8 million estate, and most importantly, to ask for an accountant from his sons to see how his money is being managed, these issues, at this point, he does not have the legal authority to bring before a court because he doesn't have the authority to retain an attorney. He's lost his voice. So in the issue... I mean, he can still seek, like, modification of guardianship. I mean, he can still bring issues that you seem to want to raise to the trial court again. The question is how, though. I mean, he can call his guardian ad litem, but his guardian ad litem, the Illinois Supreme Court has made clear that a guardian ad litem and an attorney are two different animals. The guardian ad litem will listen to his requests, but if the guardian ad litem thinks that whatever the issue is that he's dealing with is in his best interest, there's no requirement on the GL's part to bring it before the court. Now, as a practical matter, these other issues about just requesting a simple accountant to see how his funds are being managed, whether additional gifts are being made from there, he doesn't have the authority to do that at this point. I further submit to you that on March 2nd, 2016, the trial court entered a temporary order, and in the temporary order, it granted the personal co-guardians the right to sign HIPAA releases, but to retain and coordinate Joel's caregivers. In that order, Joel was specifically authorized that he couldn't sign any further contracts, he couldn't execute any further estate planning documents, like an amendment to a will or a trust, he couldn't withdraw funds from his IRA, and he couldn't get married unless his sons as co-guardians agreed to it and agreed to a prenuptial agreement. Now, that order was entered about 10 months before the trial court's ruling was entered, and it was extended several times, and Joel agreed to it every time, you know, after that. Now, following the entrance of this temporary order, I think it's very telling that there was no issues raised in the record regarding Joel's attempt, there was allegations he was trying to escape from the clerk, or attempting to change his business estate plan, or any further unexplained cash withdrawals or canceling credit cards. It seems like this temporary order took care of the great majority of issues that were affecting Joel Kaplan. It didn't mean violated? There wasn't some evidence? There was two issues. With respect to the personal issues, the issues that came up after the entrance of the order was he continually, he continued to file and dismiss caregivers. You said about 60 caregivers that he dismissed? Yes. And three or four credit cards stolen. One stolen the day he got it. That was in the beginning, Judge. That was before the case was even filed, so that was before February. That was after his sons took over that that stopped. Well, his sons actually took over in 2014, a couple days after the stroke. But one of the issues that prompted them to file the petition was the unexplained, you know, these withdrawals. But after March 2nd, those issues were called. They were, you know... He entered into a contract after that order. There was two personal issues. One was the caregivers, even though his voice is temporary personal guardians, he had the authority to monitor and retain caregivers. And they testified that they didn't really do anything to curtail his ongoing dismissal of caregivers. The other was to execute this contract with writing home, which was he wanted a new agency. The temp order said on March 2nd, you can't enter into contracts. That was one issue. I submit to you, and I put it in my brief, I mean, was this really an issue which reflected the total incapacity of a person? Because after he signed it, what he did is what he should have done, is he called his son, Brian, and said, I want to change agencies. There was one conversation that Brian had. He said, I'm going to check into it. And then on November 3rd, he left two messages. And it's undisputed that, this is Mr. Kevlin, it's undisputed that there were no phone calls after that time. The financial issues which were confronted after March 2nd, there was a purchase of a watch in November of 2016 for his lady friend. That's the sum of about $3,800. And there was ongoing concerns about exploitations, but not actual exploitations. That affected him. Now, Dr. Ander was the only doctor out of the three who opined that Joel was totally incapable of making any type of decisions. But since Dr. Ander, since his evaluation preceded this temp order, there's no, he wasn't able to opine or give an opinion whether his temp order simply put would work, which is one of the requirements of the statute. The two other doctors, Dr. Wroblewski, he actually, he not only met with Joel Kaplan, he reviewed his medical records, as well as a neuropsych evaluation that was done in October of 2016. He stated his opinion that Joel was competent to make personal and financial decisions. In its ruling, the trial court dismissed that because there was a portion where Dr. Wroblewski said that Joel Kaplan should, when he makes decisions, he should be well rested. And the trial court noted he was fatigued at times. So therefore, the court completely discounted this doctor's opinion and said, I can't rely on that. Dr. Shaw. I think that was not fatigued at times, but most of the time. Well, my, as I put in the brief, I don't think there's evidence in the record that he was fatigued on a consistent or continual basis. Now, there's also Dr. Shaw, and Dr. Shaw, he came to the conclusion, as did the guardian of the item, that Mr. Kaplan needs a limited guardian of his estate in person. And in his report, he stated that a limited personal guardian is necessary to ensure he's living in a safe and appropriate environment. And he stated that we know that this is a primary concern to Mr. Kaplan. We know that leaving the clear is a primary concern, and the reckless way that that may transpire is, again, a great concern to this court. That's part of the trial court's rulings. Now, in the death release brief, and as they stated at the trial, they stated that there was an issue of Joel playing to a lope, which was based on Brian testifying that he received, on February 25th, a single voicemail from the agency at that time saying, I think your dad is going to elope. There was also, in their brief, issues about Joel's repeated attempts to try to get away from the clear, which the trial court picked up on. And I submit to you, these were both raised, these issues were on February 25th, 2016. The very next day, Joel was evaluated by Dr. Ander. And four or five days later, he met for the first time with the guardian of the item. And if these issues were that terribly important, it's telling that neither issue was in Dr. Ander's report, and neither issue was in the guardian of the item's report. So I submit, the trial court did not refer to any testimony or evidence that it's Joel's primary concern to leave the clear, and certainly not in any reckless fashion. There was no evidence of that. Finally, we state that we believe it was an abuse of discretion to appoint Mark and Brian as plenary co-guardians of this person and this state. Who's appointed guardian is based on factors that you consider the man's preference, but it's also, the bottom line is it's based on his best interests. There are certain factors which the court considers, which were cited in the Johnson case. One of the most important is they have to be free of any interest which would conflict with their duties. Since the paramount duty of a guardian of the estate is certainly to conserve and protect the assets for the benefit, use, and enjoyment of the disabled person. We submit that the actions that were demonstrated by his sons put them squarely in a conflict of interest. And for these reasons, in the year after his trial, he signed powers of attorney, naming his sons as agents. They accepted that role. He created a trust four months after his spoke, where he appointed his sons as co-trustees in actual residual beneficiaries after his death to the exclusion of his adopted daughters. And they accepted the role of co-trustee. In the year 2015, it's undisputed that there were gifts that were made to Brian and Mark and their families. Cash gifts, gifts to pay the private school education for Brian's daughter, for giving a $78,000 debt that Brian owed to Joel. And there were discussions with Joel's financial advisor at that time about creating a gifting plan that would go up to $200,000 a year. The gifts continued in 2016, including gifts that were made by Brian and Mark to themselves and their families. And that was even after the March 2016 temp order was entered. And the record does not show that they sought the court's authority to do that. Now, the guardian-admin testified at trial that in his opinion, the POA for property and the trust specifically do not allow them to make gifts to themselves in those situations. The guardian-admin also testified that the documents do not allow Brian to assist in forgiving that $78,000 debt, which Joel could have forgiven prior to his stroke, but did not. He also stated that one of the purported reasons for this debt per the Sons was it would reduce tax liability on Joel's death. And the guardian-admin also disputed that. Now, the trial court did not address in its ruling the propriety of any of these post-stroke gifts. It didn't address the propriety of Brian forgiving a $78,000 or accepting the forgiveness of a $78,000 loan. The trial court has not entered an order compelling Brian and Mark to file an accounting either as a property agent or as a trustee. And we feel that this constitutes a clear conflict. And I'd like to say, just wrapping up my initial comment, there's absolutely no, it's crystal clear law that if you accept the role of being a property agent under a POA attorney, or if you accept the role as trustee, you have a requirement to account. There's a duty to maintain the records, to keep the records, and to account for the disbursements and the investments that were made during the administrative period. That was not done in this case, and the court didn't even, for all purposes, it didn't appear that it considered it in its ruling. So we have a situation where Mark and Brian, as trustees, have to account. The issue is who do they account to? Now, in many cases, a trial court will appoint a guardian for the sole purpose of accounting. They review the account, and if there's any improprieties, that guardian can bring any of these issues to the court. But that hasn't been done in this case. Isn't that something that you could raise in the trial court? Well, Joe cannot, he does not have the authority at this time to retain an attorney. My appearance is, I filed an appearance in the trial court after the trial, so I cannot do it. The court gave me the authority, the limited authority, of pursuing the appeal. She did not give me any authority whatsoever to bring any other issues, any other outstanding issues, on Joe's behalf in the trial court. So, again, at this point... Were there still things pending in the trial court at the time this appeal was taken? Yes. And who's representing Mr. Kaplan in those matters? As an attorney in the trial court, to my knowledge, no one. That sounds almost inconceivable. See, Mr. Kilgus here had been representing him during the trial. After the trial, though, he doesn't have the authority, the on-going authority, to represent Mr. Kaplan in the trial court. Now, the guardian ad litem may bring issues, but again, a guardian ad litem, the Supreme Court case of Inouye Mark W., a guardian ad litem and an attorney are two different animals. Okay, but let me, I'm sorry, there's also two more appeals. I'm not really, I'm not involved in either one. Who's representing Mr. Kaplan on those appeals? I don't know. You're not involved with the guardianship case? I can say that I don't represent him in any other appeals, and I don't have any, I'm not following the appeals. Okay, thank you. Thank you. Now I'd like to just, five minutes just for a rebuttal. I'll let you just state your name again. Yes, Eric Dorkin, E-R-I-C-D-O-R-K-I-N, for the co-guardians and the appellees. I want to go back to the total versus limited or plenary versus limited issue that counsel started with, and I apologize if I sound like a bit of a pedant, but hopefully I can bring this to a crescendo. I'm going to walk through the statute and get to the point where we're here on appeal on what Judge Bolliker didn't do according to the appellant, and I'm going to show you that they've never asked Judge Bolliker to do the things that they're asking you to do, nor have they actually asked you specifically to do something. So working through the Probate Act, there's 5-11A-3, A-12, and A-14. And the line with the A-3 statute sets forth when a guardian or the person and the guardian of the estate are necessary. A guardian of the person is necessary when the person doesn't have the understanding or capacity to make or communicate responsible decisions. So the analysis that the trial court will look for for a guardian or the person is, is this person making or communicating responsible decisions? For a guardian of the estate, it's a question of whether, because of the disability, the person is unable to manage his estate or financial affairs. So management is the key verb, or is that the thing that the person can or can't do? So then once we decide that the person can't, if the person can make responsible decisions or can manage the cases over, we don't have to look at another statute. If there's some concern about that, we then go to A-12, which is the order of appointment, which says when the person lacks some but not all of the capacity specified in 11A-3. So then it's a limit. So the guardian of the person, the total, the word total, which occurs in A-12C, refers to the capacity in 11A-3. So the question is, can the person make any responsible decisions? Can the person manage any finances? The totality is tied to management and responsibility. And so the question for us at trial, as the petitioners, in seeking a plaintiff, is to demonstrate that Mr. Kaplan cannot make responsible decisions, period. He cannot manage his financial affairs, period. Then the question, if you're asserting that it should be a limited, either the trial court says, I don't think it's total, or in this case, Mr. Briggs is the co-petitioner on behalf of Mr. Kaplan, seeks a limited, then you go to A-14, which says how you carve up limiteds from penalties. And they work slightly, A and B, where they work slightly differently. Under A, for purposes of the person, you have to give the authority to the guardian. So only those authorities given to the guardian are the ones, the order will say the guardian may do this, the guardian may do that, and anything not given stays with the ward. For purposes of the estate, under B, the authority is actually given to the ward. You, Mr. Kaplan, may do this, and you may do this, and anything I don't say remains with the guardian. So now here we are with a torn or plenary guardianship. And what counsel has been arguing to you is that no, they should be limited. And I want to focus on guardian of the person first. What are those things that we're talking about? What are the authorities under 11-A-14 that can be conferred to the guardian as opposed to stay with Mr. Kaplan? Well, one is guardians of the person can have access to medical information. That's almost routine if there's any guardianship. The guardian has to have access to the medical information. Typically, guardians of the person do not get control over medical decisions because the medical decisions themselves are handled under the Healthcare Surrogate Act, which are based on decisional capacity, which is a decision for the doctor at that point in time. So the court doesn't, in advance, unless it's something truly catastrophic as a disability, confer to the guardian medical decision-making. And that's not what's happened here. For purposes of medical care, the guardians receive access to the doctors. But the other two big authorities that can be given to a guardian or retained by the lawyer are residential placement and visitation. Now, you can look through the trial record, you can look through the appellate briefs, and you can listen to my distinguished counsel's argument. He hasn't told you that he wants those back for Joel. The argument has to be not that total wasn't against the manifest way of the evidence, but providing the guardian's residential placement was against the manifest way of the evidence. Providing the guardian's authority for visitation was against the manifest way of the evidence. That is the issue. Are the authorities granted to the guardian in this case wrongly decided? Now, with that in mind, the record is replete with evidence before the trial court. The two things that Joel Kaplan could not manage were his residential placement and visitation. We had firing more than 60 caregivers. He attempted to hire Lydia and fire a care agency when Lydia herself was not a licensed caregiver. Essentially, as Judge Barber found, it was chaos at the clerk where Joel was staying. So the question then becomes, given that evidence that is in her 17-page findings of fact, 17-page transcript findings of fact, where is she wrong? There's no fact that she's wrong about, first off, and there's more than sufficient evidence to demonstrate that Joel cannot make responsible decisions regarding residential placement and visitation. So as such, neither of those were against the manifest way, and Judge Barber should be affirmed as to the plenary value of a person. Guarding the estate is slightly trickier because of the stipend issue that I'm going to get to in just a moment. But typically then, guarding the estate issues are sort of blanket access to funds, management of funds and investment accounts, general contracting, and marriage. And in this case, you haven't heard, again, you can look at the trial paper, you can look at the briefs and you can listen to our argument. Counsel hasn't told you which one of those he wants to go back to Joel. In other words, which one of those was against the manifest way of the evidence? He's told us what he wants to go back to Mr. Kepham, but... Well, the stipend. The only thing... Dr. Shaw and the GAL said that they believe that there should be a limited guarding of the estate for the purpose of Joel having a stipend or an allowance. And I would suggest to you respectfully that that isn't a limited guardianship. Joel isn't. It's not. I would say the language for guardianship is, is he managing his money? He's not managing that money. What's happening is he's given that money to spend as he sees fit. If he's given $10,000 a month and he buys $10,000 worth of gummy bears, he can have a tummy gate but no harm has been done. He doesn't have to pay bills with that money. He's not managing it. He's spending it. It's not... There is no authority there. He's just spending. He doesn't have to pay bills. If he blows it all, nothing bad happens. So there is no management of money. He doesn't have to pay off a credit card if he uses it. That gets done for him. The authority to manage, to pay the bills, to prepare budgets, is this enough? Is this too much money to give him? Those decisions are made by the co-guardians. So when everybody says they want a limited for the stipend, the stipend doesn't make it a limited. It's just simply something that Joel can have in large part because it preserves his dignity as best we can. One of the difficulties of this case is that Joel Kaplan worked extremely hard as an attorney for a very long time to amass the money that he has when he retired. And he doesn't get to enjoy that. He doesn't get to enjoy it because of what happened to Stroke, and that's unfortunate. So long as he's not managing it, so long as he's not responsible for the money, everything is fine. He can have the money to spend it. He can go out to dinner. He doesn't have to call up people and say, can I go out to dinner? He has the money. He can do it. Can I go to the movies? Yes. Can I go to a ball game? Yes. He has that money. That's not contracting. I know that because we let people under 18 do that. People under 18 can go to ball games and pay for tickets. People under 18 can go to the supermarket. People under 18 can pay for dinner at restaurants. What we're doing is we're giving him money to preserve his dignity as best we can. What we're not doing is giving him authority because authority is a problem. And that's something that the record is replete that Joel can't manage and Joel can't handle. He gave out his ATM and AZTAM pin. Lost credit cards. Unknown cash withdrawals. The incident with the watch three weeks before trial where he didn't know that his then girlfriend purchased this $3,200 watch that day when he was called about the fraud alert. And then he gets his story wrong as to, I told her to buy it at Martin and Martin. And she said, no, no, he told me to go to Tiffany's but I went someplace cheaper. Joel is a good man that got a bad deal. That's the unfortunate. And we talk about Joel, the warden, and we take away his rights. It's unfortunate, but we have to protect him from himself. And we have to choose the least restrictive way to do it. Unfortunately, the plenary is the least restrictive way. The problem we have with Joel and the right of home issue and the firing of Senior Bridge is the issue. Unless there's a plenary order that can be shown to third parties. And we don't get into a debate with third parties about, well, do you have this authority? Did he have this authority or not? The answer is no, he did not. Joel, that contract Joel signed with you is void. He's the same. I don't see anything in the record, they don't cite any fact that Judge Bonhoeffer got wrong. The record is replete with facts showing all of the things that she referenced and heard in support of her finding that none of those limitations that Joel could retain are appropriate. And for that reason, we ask that you affirm the plenary guardianships of the person in the estate. Turning to the conflict of interest issue. Can you address that there's never been an accounting? Yeah, there's never been a request for an accounting. This is an awkward issue because there are certain facts outside the record that happened after the trial that I could say, I don't know if it's appropriate for reference. No, but there hasn't been. Can Mr. Kaplan not hire an attorney? No, so how would that work? The way that typically works is there's a GAL appointed. And the GAL, in this case, Michael Delaney, he's been on the case since the temporary was entered in March of 2016. So he knows Joel, he knows all the players. If Joel has any issue, all he has to do is tell the GAL and the GAL will tell the court. And if the court wants an accounting, under the statute is 755 ILCS 5-11A-18, where it specifically says that guardians have the right to trust accounting. She can ask her guardians to give her that accounting. So if Joel wants to see the accounting, just ask the court and the court can order. But that request has not been made to the court. Joel doesn't need a lawyer for that. The GAL can do it. But that's something that could easily remedy the accounting issue. And that's typically the way it works for any board that has a plenary guardianship. They can't hire an attorney, but they can certainly bring concerns in front of the court. In fact, with an active GAL who's not been discharged, that's the easiest mechanism. And the GAL can say to the court, in my view, whether it's this issue or a different issue, it's in the best interest of the ward because that's the touchstone for the GAL. I believe it's in the best interest of the ward that you do this. I believe you don't. I leave it to you, Your Honor, you decide. So it's the GAL that could bring an application to modify the guardianship? I think typically the way that would happen is the GAL would say to the court, Mr. Kaplan would like an application to modify. I believe that there is some merit to it. At that point, the judge can then appoint counsel to be paid from the estate to prosecute any modification or claim. So that would be the typical mechanism for anything. Somebody, I think it has merit, or even if the court says I think it has merit, I'm going to appoint for the limited purpose of doing this. Because I don't want my guardians to do it. My guardians can't do it. Most of the guardians agree. If the guardians agree, yes, we think a modification is appropriate. We agree. So if he wants to seek a change in status, he can say that to the court. The court can consider it. And whether he would get counsel for that would be up to the court to decide. It would not be up to the guardians to decide. But there is a mechanism by which all wards can get in front of the judge to express concerns as to what is not being done in their best interest. So as for the conflict of interest itself, the statute as to who may be a guardian is 11A-5. And there is nothing in there that expresses any per se bar to people serving as trustees and guardians. Judge Moniker made express findings in her ruling that as per guardianship, she found that Mark and Brian had a long-term loving relationship with their father. They were acting sincerely out of a desire to help their father, and that they had actually, in fact, helped their father. They tried to do it with the POAs, but POAs have limitations. And one of those limitations is marriage. They could not stop their father from getting married. POAs can give you the authority to sign checks. It was when they got to Chicago in February of 2016 where there was all sorts of chaos going on at the Clare that, and this is undisputed in the trial record. Phil Kaplan did not testify that this is untrue. He said he was trying to elope with Suzanne and he was trying to get away. That's not challenged in the record. It was only then that they sought guardianship because that's the power that POAs could not control. And from that time, they operated for nine months as temporary guardians in front of Judge Moniker. She got to see them. She got to interact with them. She watched them testify. So there is no per se violation, and the evidence itself shows no self-dealing. As for the gifting, this is also undisputed in this case. Joe Kaplan wanted a financial advisor after the stroke. So he asked Mark and Brian for their financial advisor, and they said, no, you need to choose your own financial advisor. So he asked them to look into a gentleman by the name of Mr. Kitzinger who lives up in Wisconsin. They did, and Mr. Kitzinger has been doing that role as financial advisor from then to today. Joe is above the lifetime exemption. So right now, he actually has a taxable estate willing to pass away. And one of the things that Mr. Kitzinger developed was a gifting program of about $100,000 to $200,000 a year. Again, there's no dispute that it was Mr. Kitzinger's idea in an attempt to get that money down below the exemption because one of the things that is in the best interest of the ward under the Guardianship Act and under the trust, in our view, is avoiding inheritance taxes on debt. Counsel is correct that the GAL did not think the trust permits that. I disagree, and the GAL is not the judge. The trust, as was introduced in court, allowed the trustees to make any gifts that were in the best interest of the grantor. That was the language. Now, in trial, the GAL said he thought it was plausible, but he didn't like that reading. But I believe that there's nothing improper about the gifting that was designed by Mr. Kitzinger to get Joe below the lifetime exemption that the court was completely informed about and up front about. So there is no actual conflict of interest. They did design it. The court is correct. If the trial court wants an accounting, Judge Gallagher could simply ask for one. The GAL could make that request on Mr. Joe Katzman's request that under the statute, that she order the guardians to get one and the guardians would provide one. So again, there's no conflict of interest. There's, again, no error. Nothing against the math. That's what the evidence says to the plenary guardianship. So the co-guardians ask that you affirm Judge Gallagher on all grounds. Thank you. I'll try to be brief. Counsel pointed to the order of appointment section 11A12 because we do not disagree that Mr. Kaplan has impairments. We don't disagree he needs a guardian. Our position, it's very important to him that he receive a limited guardian. Now, when you look at 11A12, it states if the respondent is a judge disabled and to be totally, totally without capacity, then if the court finds that limited guardianship will not provide sufficient protection, then the court appoints a plenary guardian. The previous section, 11A12V, states if Joe is a judge to be disabled and to lack some but not all, and again, that gets back to my argument, that it's their burden of proof to demonstrate by clear and convincing evidence that would leave no reasonable doubt in the mind of the trier of fact that he is totally incapable of making any decisions. But this issue is a proof issue, and that trial, Mark and Brian had the burden to prove that their father was totally incapable of making any decisions. Once the court comes to that decision, and this is why it's so important, under 11A14, if the court determines that he is totally incapable of making any decisions, that's when plenary guardians are appointed. And all the personal and financial authorities under 11A17 and 11A18 are then transferred, invested, and entrusted to the plenary guardians. If it's a limited, if he has some capacity, if it's not total, then, as counsel said, there are cutoffs to what a limited guardian can do when specific authorities are granted upon them. Also, most importantly, under 11A14, the appointment of a limited guardian does not constitute a finding of legal incompetence, which would allow him to contract and, for instance, retain attorneys who could represent him in the trial court. Now, with respect to the proof, again, a number of the issues that were considered by the trial court, the PIN, you know, the cash withdrawals, that all happened, that was a reason which prompted them to file the petition initially. This all preceded the petition. But all of those factors were specifically considered by the guardian ad litem, by Dr. Obelsky, and by Dr. Shaw. And after they considered them, both Dr. Shaw and the guardian ad litem testified that notwithstanding all these factors, a limited guardian order would be able to address all this while still maintaining and trying to give Joel the objectives and purposes of the statute, which is to make him as self-reliant and as independent as possible. And I submit that the plenary order has done none of that. You talked about, counsel talked about the long-term loving relationship between Joel and his sons. Before the stroke, the evidence is undisputed, they had a great relationship. They would talk on a regular basis. They would go to ballgames every year. They had a great relationship, even after the stroke. The evidence is that they had a very good relationship. Once the guardianship proceedings started, the testimony that Joel gave at trial was during the entire year of 2016. His son Brian did not visit with them. None of his grandkids visited with them. The daily talks that they enjoyed previously, they talked maybe a handful of times a month. And Mark visited one time in the year 2016 when he was on town for another conference. And again, is this order directly responsible? No. Do I think that there has to be a limited that could, that mends this? I think absolutely. And both the guardian and Dr. Shaw talked about the carve-outs that could be done. Now, counsel said that we didn't specifically ask for what authorities Joel wanted back. If I could just take a second. On page 18 of my reply brief, we stated, As you testified at trial, Joel wishes to retain control of a monthly stipend, decide where he lives with the assistance of caregivers, and decide who can visit with him. In addition, Joel greatly wishes for limited guardianship so that he can retain an attorney who can bring Joel's concerns before the court. As it stands, Joel, who is a highly functioning and respected attorney, and he was a senior partner at the time of the stroke of C-5 Shaw, one of the largest firms in Chicago, has absolutely no voice in any personal financial decision being made in his life. Further, at the bottom, although Joel acknowledges some impairments, these impairments are not great enough to justify removing his voice with respect to making decisions about where he lives, who can visit him, where he buys his groceries, and other basic human dignities, which he should be entitled to enjoy. So we've been very clear that in terms of what he specifically requires, which is all in light of his limitations, and the carve-out that was described by both the guardian of the item and Dr. Shaw includes these factors. With respect to the caregivers, that's an issue that a limited guardian addresses all the time in probing. You appoint personal guardians who manage the caregivers. You appoint a case manager, an effective case manager, that deals with these issues. And you take away the authority for him to hire and fire. He can express preferences, but he doesn't get the right to fire him anymore. In a trial, he testified that he would agree to that. With respect to his stipend? He would agree to what? He would agree that the case manager, to the appointment of a case manager who can manage his caregivers, and also to the personal guardians being able to retain and monitor and even fire caregivers. And that was in the previous order. See, that's the thing about this case. The temp order that was entered in March of 2016, the court's order is like, I don't know how I could do a limited order to protect them. We already did. You did it 10 months before the trial in March. And with the exception of the right-of-home contract, which I still say, which certainly is not sole grounds coupled with Dr. Lender's report to require a primary guardian. And all these rights being taken from him, these issues are addressed all the time in probate. An effective case manager could be appointed with a personal guardian, and they manage the caregivers, not Joe anymore. And this, I submit to you, is the cases that I cited in my original brief, they talked about a person's eccentricities. This is his eccentricity. This is his peculiarity. The issue with laundry. Why is he so particular about the laundry? I don't know, but this is his issue. So you appoint a case manager that talks to him, and this gets ironed out. But you need a primary guardian to address that issue. I submit absolutely not. With the stipend, you give him a true link card. You know, you put so much on it a month, he gets to spend it any which way he wants. And the beauty of that, you can sort of tailor it in terms of what he can do, what he can't buy. But he gets to spend up to $5,000, $6,000 a month. And the co-guardians can monitor. He can see what they're spending. So if they have any concerns, it will be on the screen. The counsel talked about this gifting plan. At the time they discussed this a couple years ago, he had a taxable estate. His estate is about $7 or $8 million. The tax loss has since changed. The federal exemption has jumped over $11 million. So at this point, it may not be taxable. So what the impetus is for that gifting plan a couple years ago, if it's to save taxes, I would submit to you that that's no longer an issue. The accounting, counsel talked about an active guardian ad litem. They've been managing his money since 2014. The evidence is undisputed. Joel has not seen an accounting of what they've been doing. Now, even though a guardian ad litem could go into court, he doesn't have any control over that. If a guardian ad litem is appointed by the court, there would be eyes and ears of the court. And the Mark W. case, which is the Illinois Supreme Court case, specifically stated guardian ad litems and attorneys are different. So Joel lost the ability to contract under 11-822. It is an offending fact he cannot retain an attorney to request an accounting. My brief has mentioned an accounting. He hasn't received an accounting. And he's not going to be able to retain an attorney at this point under primary guardianship to go into court before Judge Balico, before the Chancery Division, to request an accounting. It's also undisputed that before March 2, 2016, when the temp order was entered, Joel could have got married, but he didn't. He could have changed his estate plan, but he didn't. He could have withdrawn funds, but he didn't. He could have done all of these things. It's undisputed he had that authority, but he didn't. He agreed to the extensions of the temp order, which limited his rights to contract, to get married, to withdraw funds, even to amend his estate plan. That's how desperate he is for limited guardianship. Because at this point, he has gone from being a senior partner at Safe House Shaw, unfortunately, to deciding basically what he's going to wear that day and what he's going to have for lunch. But all of the other authorities relating to his person and to his estate, at this point, he does not have authority over. So for all of these reasons, and it's that important to him that he brought this appeal. So for all of these reasons, we would request that this court reverse the trial court's order to amend, with inspections, a foreclosure of limited guardians other than his son's objective guardians, so that way we could obtain accountings and see how his funds are being managed. Thank you. I thank both sides. It's really nice to see you, Mr. Kaplan, in court. And it's a very serious case, and we certainly take it seriously. And at this time, we're going to stand adjourned. Thank you very much.